<u>Memorandum of Law – Ground 1</u>

The Movant claims District counsel was ineffective when he failed to identify Ex Post Facto violations permeating every facet of the proceedings against him beginning with the Grand Jury Indictment and continuing on through the Extradition process, Arraignment, Plea Agreement, Change of Plea Hearing, and Sentencing. These Ex Post Facto violations led to the imposition of three sentences far in excess of the applicable statutory maximum sentences the Movant could have received. It must be noted that the Plea Agreement stated that the 1998 U.S. Sentencing Guidelines were to be used in the Movant's case and they were part of the Pre-Sentence Investigation Report presented to the Sentencing Court. It should be stated up front that the Movant had every reason to believe District counsel was capable and knew what he was doing for the simple reason he came highly recommended by Judge Adams: "Mr. Bartoli, cooperate with Mr. Ward. He has been around a long time. He is seasoned, and he will assist you in the defense of this matter." (See Appendix C, PgID #9)

The District court reviewed the PSIR, but sentenced the Movant to the current maximum sentences available for the charged offenses, and not the maximums which actually applied to the Movant. All three of the Movant's 240 month sentences, ordered to run concurrently, are far in excess of the statutory maximums for the offenses of conduct from 1995 to 1999, which should have been 60 to 120 months maximums. The Movant was sentenced to the following concurrent terms and counts:

| Count | Charge/Statute | Old Law | Sentence |
|-------|----------------|---------|----------|
| 1 | 18USC§371/Conspiracy | 60 | 60 |
| 2* | 15USC§78j(b)&78ff(a)/ Securities Fraud | 120 | 240 |
| 3 | 15USC§77e(a)&77x/ Sale of Unregistered Securities | 60 | 60 |
| 4* | 18USC§1343 / Wire Fraud | 60 | 240 |
| 5* | 18USC§1341 / Mail Fraud | 60 | 240 |
| 6 | Dismissed | ---- | ---- |
| 7 | Dismissed | ---- | ---- |
| 8-10 | 26USC§7201 / Attempted Tax Evasion | 60 | 60 |

(Judgement, R44, PgID # 270-272; Appendix <u>J</u>)

It's clear that counts 2,4 and 5 have a wide variance from what the old law maximum sentences were to what are the current illegal sentences the Movant is now serving.

In the Indictment (Appendix P; PgID# 5,16,30,50,53,55-57) and in the Judgement
(Appendix J; PgID# 270) the allegations of the criminal conduct in this case all
agree that the "offense ended" as of August 27, 1999. This was approximately three
years before the Sarbanes-Oxley Act of 2002 which increased the maximum penalties for
counts 2,4 and 5 of the Indictment. This case has contained many errors over the
years it has been ongoing. One of the first errors was/is from the Indictment handed
down in 2003; count 2 used a flawed statutory maximum. The same flaw was included in
the Extradition proceedings and neither flaw was observed by District or Appellate
counsel even though it hid in plain sight. District counsel then compounded the error
by negotiating a Plea Agreement containing not one but three flawed statutory
maximums (counts 2,4 and 5). (See Appendix L)

With respect to count 2, District counsel compounded his error by failing to examine
the §78ff penalties. The Movant was charged with §78ff(a) which carried a 10 year
maximum sentence at the time of the alleged crimes. This penalty implies the Movant
was an "issuer", whereas the Movant actually acted as the fund advisor, i.e.,
overseeing investments. All issuance of shares, calculation of net asset value,
preparation of statements, etc. were handled by his partners. If that is the case
then the Movant should have been charged with §78ff(c) which carries a five year
maximum sentence. District counsel was aware of the Movant's role but never discussed
the difference in charges with him and never raised the objection. By allowing the
Movant to be sentenced to something he wasn't guilty of, he created a Rule 11
violation, specifically 11(b)(1)(H) and 11(b)(1)(M). What's more the court violated
Rule 11(b)(3) when it failed to determine there was "a factual basis for the plea.

With respect to count 2, specifically 78ff, the Statute states:

> "but no person shall be subject to imprisonment under this section for the
> violation of any rule or regulation if he proves he had no knowledge of such
> rule or regulation."

This effectively shifts the burden of proof from the government and puts it on the
Movant, and is a violation of his due process and the 5th Amendment to the US
Constitution. What's more the idea of trying to "prove" you don't know something; its
ludicrous. District counsel should have seen this and objected to the inclusion of

count 2.(See Appendix M)

District counsel exposed the Movant to illegal sentences in violation of his 6th Amendment Right to Effective Assistance of Trial Counsel. As the court stated in Lee v United States, 582 US____,137 S CT____,(2017):

> The 6th Amendment guarantees a defendant the effective assistance of counsel at "critical stages of a criminal proceeding", including when he enters a guilty plea. Lafler v Cooper, 566 US 156, 165(2012); Hill v Lockhart, 474 US 52, 58–59 (1985)

Imposing a sentence on the Movant in excess of the statutory maximums in effect at the time of his offense of conduct violates the Ex Post Facto Clause of the Constitution. See United States v Lanham, 617 f.3d 873 (6th C,2010).("The Ex Post Facto Clause bars application of a law that changes the punishment and inflicts greater punishment, then the law annexed to the crime when committed." quoting Johnson v United States, 529 US 694,699 (2000)).

"An illegal sentence – one 'where the terms of incarceration exceeds the statutory maximun'– trigger[s] perse, reversible plain error." United States v Tittles, 852 F.3d 1257,1264 (10th C. 2017). See also United States v Barajas-Nunez, 91 F.3d, 826,830 (6th C, 1996)(acknowledging that an illegal sentence is plain error); United States v Jackson 2000 US App LEXIS 22981 (6th C,2000)(noting that when a defendant receives sentences in excess of statutory maximum, his "rights have clearly been substantially affected; moreover, such a sentence would clearly tend to call into question the fairness, integrity, and public reputation of the judicial proceedings.")

Appellate counsel was just as ineffective as District counsel. Appellant counsel failed to include it as an issue in the Direct Appeal in spite of e-mails from Movant to the contrary. The only difference being that Appellate counsel admitted they were ineffective in their "Motion To Stay Resolution Of Petition For Rehearing..."In referring to the constitutional plain error involving the illegal sentences imposed by the District Court, Appellate counsel said:

> "From inception of this case through the filing of the Petition for Rehearinng on April 30, 2018 (refiled on May 1, 2018)undersigned appellate counsel,

3

predecessor trial counsel, the government, Probation and the District Court
itself had overlooked the issue".(Appendix D).
Although the government admitted the illegal sentence in their response(Appendix B,
Pg 2), the Petition fell on deaf ears. If in fact the Movant should have been charged
with 78ff(c) as previously mentioned then all of his sentences would have been 5
years meaning the Movant would have been freed one year ago and he is now being held
illegally.

The June 18, 2018 Supreme Court decision in the case of Rosales-Mireles v United
States, 2018 BL 214344, No. 16-9493, determined that plain error under Federal Rule
of Criminal Procedure 52(b) resulted in a longer sentence then is justified and
affected the fairness of the judicial proceeding. The failure to correct the error in
this case is affecting the Movant's Due Process Liberty Interest Rights under the 5th
Amendment and given the fact the Movant carried these illegal sentences for close to
three years, it could be construed as cruel and unusual punishment in violation of
the 8th Amendment. For all the foregoing reasons the Movant is asking that the
sentencing and plea agreement, as well as the Indictment be vacated. This
justification is the violation of the Movant's 6th Amendment Right to Effective
Assistance of Counsel at both the District and Appellate level, the violation of his
8th Amendment Right against Cruel and Unusual Punishment, the violation of the Ex
Post Facto Clause of the US Constitution, and a violation of the Movant's 5th
amendment Due Process Liberty Interest Rights.

## Memorandum of Law – Ground 2

The Movant claims District counsel was ineffective when he failed to review a question of law related to the violation of his 6th Amendment Right to a Speedy Trial, a structural error in his case. Under the Brecht analysis "Structural errors" are considered to be prejudicial and accordingly are considered reversible. In order to determine if the Speedy Trial Right has been violated, the court must examine and balance four factors: [1]enght of delay, the reason for delay, the defendant's assertion of his rights, and prejudice to the defendant." See Barker v Wingo, 407 US 514,530 (1972). An examination of these four factors as applied to the Movant's case follows:

A. **Length of Delay** - For Speedy Trial claims, the length of the "delay is measured from the time of the indictment to the time of the trial." See United States v Gregory, 322 F.3d 1157,1162 (9th C, 2003). If the length of the delay is long enough to be presumptively prejudicial, an inquiry into the other three factors is triggered. See Barker 470 US at 530. Generally, a delay of one year is presumptively prejudicial. See Gregory, 322 F.3d at 1161-1162. In the Movant's case the indictment was filed on October 15, 2003, it was not sealed, and yet he was not arraigned for trial until October 29, 2015, twelve years later (and 17 years after his last alleged crime). There is sufficient legal precedent to conclude a 12 year delay creates a presumption of prejudice and should trigger an inquiry into the other three factors. Unfortunately, District counsel paid no attention to the delay.

B. **Reason for the Delay** - The government has the primary, though not exclusive, responsibility to ensure the defendant is brought to trial. See United States v Sandoval, 990 F.2d 481,485 (9th C. 1993). If the defendant is not attempting to avoid detection and the government makes no serious effort to find him, the government is considered negligent in its pursuit. See Doggett v United States, 505 US 647,653. The 6th Circuit is even more stringent saying, "a defendant has no duty to bring himself to trial; the government has the duty." United States v Ingram, 446 F.3d 1332,1337 (6th C, 2006) Due to the government's"Affirmative constitutional obligation to try the defendant in a timely manner...the burden is on the prosecution to explain the cause of the pre-trial delay." United States v Heshelman, 521 Fed Appx 501,506 (6th C, 2013).

1

In the Movant's case it has been continually stated that "he fled abroad to avoid arrest." See United States v Bartoli. The Movant explained to the District counsel this was factually incorrect saying he did leave the US in OCtober 2000 after applying for and receiving a US Passport in Boston, Massachusetts. The intention was to return to his home in Perú, a country where he had married, maintained a home, raised his children, and worked. It was explained to District counsel that some months after he returned to Perú he decided to apply for Peruvian citizenship. As part of the requirement he had to ask the FBI for confirmation he had a clean record.
In 2002 he received the confirmation at his home address (see Appendix Q). Futhermore, his home address was registered with the US Embassy in Lima, Perú.(see Appendix K), an address the Movant lived at until sometime in 2006, three years **after** his indictment. In 2007 the Movant purchased a house in his name at Calle Independencia #55 in Paracas, Perú where he lived until 2012. Any interested party could have gone to the Registrar of Deeds Office in Lima, entered the Movant's name, and they would have found the address. What's more, during this time the Movant had bank accounts in his name at Interbanc, Banco de Credito, and Scotiabank, credit cards in his name, a mortage in his name, as well as a Peruvian driver's license and Passport in his name.

As stated the Movant was indicted on October 15, 2003 and yet the government never petitioned Perú for the extradition until March 29, 2010 (see Appendix E, Pg  ), six and a half years later. Also, there are other factors that call into question the government's behavior:

 I)At no time was the Movant's Peruvian or US Passport "red-flagged."
 II)Interpol was not instructed to look for Movant until 2012, two years after the Petition was presented.
 III)The government made no effort to notify the Movant of the Indictment, and there is no proof he knew about it.
 IV)The US Attorney's Office never notified the court it was having a problem locating the Movant. The government cannot indict the defendant and then delay the case indefinitely, without notifying a federal judge. See United States v Battis, 589 F.3d 6673,680 (3rd C, 2009). The government "bears the burden to justify the delay." See United States v Hakeem, 990 F2.d at 770 (3rd C, 1992). An 11 year gap in the Docket entries (see Appendix I) in the District court proves the government made no such effort.
 V)The government claims by their actions they had a Treaty in place to extradite the Movant, but they never resorted to the Treaty until 2010.

VI) The government could have requested a "provisional arrest" long before 2010, but they chose not to.

In Heshelman, 521 Fed Appx 501, the 6th Circuit stated that "a person under investigation for a crime in the US is not transformed into a fugitive solely on the basis of his/her residence in a foreign jurisdiction or country" (quoting Mendoza, 530 F.3d at 763) and yet that's what the US Attorney's Office did. The 6th Circuit went on to say that, "once an indictment is filed, the government must be reasonably diligent in its efforts to locate the defendant charged" and "the government is obligated to act diligently even when the defendant is in a foreign country." See Heshelman. Finally, the 6th Circuit stated, "if the defendant is unaware of the indictment, the governments burden is even higher." In conclusion, a reasonable man would look at the government's actions in this case and conclude they were beyond negligent and were in fact intentionally dilatory. Yet District counsel ignored all of this.

C. The Movant's Assertion of His Right – With the respect to the "assertion of his rights", the Movant couldn't possibly have asserted his rights since he had no knowledge of the indictment. The 6th Circuit has stated the "government must prove the defendant had knowledge of the federal charges." See United States v Brown, 169 F.3d 344 (6th C, 1999). Instead, the government made wild accusations at the District court level, without presenting evidence, that somehow became "fact" chiseled in stone. These accusations went unchallenged by District counsel even though the Movant informed him of the inflammatory nature and provides him with documents from the FBI and US Embassy that clearly demonstrate the government knew his whereabouts. To date the government has provided no evidence that the defendant knew of the indictment.

D. Prejudice to the Movant – The presumption that the pre-trial delay prejudices the accused intensifies overtime. See McNeely v Blanas, 336 F.3d 882 (9th C, 2003). Where there is government negligence but no bad faith, judicial "toleration of such negligence varies inversely with the protractedness." See United States v Schreane, 331 F.3d 549 (6th C, 2008)(quoting Daggett, 505 US at 657). In the Movant's case, the protractedness exceeded any reasonable limit and there's no justification for the delay. To limit the possibility the defense will be impaired is the most important interest of the fourth Barker prong. See United States v Jackson, 473 F.3d 660 (6th C, 2006).

The US Supreme Court has recognized three forms of prejudice that can result from past post-indictment delay:

    I)Oppressive pre-trial incarceration – The Movant was imprisoned 22 months in a Peruvian maximum security prison.

    II)Anxiety and concern of the accused

    III)Possibility the accused defense will be impaired, and is the most serious.

With respect to (III) the impairments in the Movant's case are as follows:

    I)The Movant's partner, James Luther Binge, was a CPA and the company accountant who produced the fraudulent balance sheets everyone relied on (see Appendix N). Binge also did the Movant's tax returns. Binge died in 2006 so the Movant has no way to question him with regards to his actions.

    II)Many of the company's clients have passed away, so they can not be questioned with respect to who they actually dealt with when they opened their account, how they paid and to whom they paid. This violates the Movant's 6th Amendment Right to confront witnesses.

    III)Evidence is stale due to the passing of time.

    IV)Twenty years dims/distorts memories

    V)The Movant's lawyer from 1996-2000, Brian Pelzmen, knew this case better then anyone and wanted to defend the Movant. He was unable to do so, contracting leukemia in 2014 and he died in 2017.

    VI)Files are missing, either misplaced, lost, or confiscated for what ever reason

    VII)The Movant doesn't have the resources to defend himself that he had in 2004

    VIII)The Victim Impact Statements used against the Movant, presented at the last minute, for the most part were not prepared by the actual "victims". Many were written by descendants, children and even grandchildren. Some were victims of a prior scheme launched by the Movant's partners, the Movant was in no way involved, and the clients money was "rolled over" into the fund. In these specific cases no money ever entered the fund, but the Movant's fund was on the hook for the debt. District counsel had knowledge of this and failed to raise an objection to the late presentation, to the fact that much useful information was redacted, and many were not prepared by actual victims.

In ignoring the Movant's claim of a "Speedy Trial" violation the 6th Circuit did not follow the 'Stare Decisis' of its own case law from Heshelman. Herein, the Movant has

shown the length of the delay was brutally excessive and the reason for the delay was due to goverment negligence that reaches the point of being intentionally dilatory. Also, the Movant couldn't assert his 6th Amendment right since he had no knowledge of the Indictment. Finally the Movant  has demonstrated how the delay caused significant prejudice to his case, thereby meeting all four prongs of the Barker test. Heshelman was a fresh case from District counsel's circuit with many similarities to the Movant's case and District counsel should have known about it and should have checked into it. Instead, he chose to do nothing. The remedy for a 6th Amendment violation is dismissal of the case with prejudice. See United States v Bilsky, 644 F.2d 613,617 (6th C, 1981) and is the same remedy given to Heshelman.

<u>Memorandum of Law – Ground 3</u>

The Movant alleges that District counsel was ineffective when he failed to
challenge certain <u>illegalities with respect to the Movant's extradition</u>. The
government based their Petition to extradition on the "Extradition Treaty
Between the United States of America and The Republic of Perú"(see Appendix
A). As set forth in the United States v Rauscher, 119 US 407,418 treaties are
the Law of the Land. They are law whenever its provisions prescribes a rule by
which the rights of a private citizen or subject may be determined, and when
such rights are in a nature to be enforced in a court of justice, that court
must resort to the Treaty for a rule of decision for the case before it, as it
would to a statute. See Rauscher at 419(quoting Edye v Robertson(Head Money
Cases) 112 US 580 (1884))

The "Extradition Treaty Between The United States of America and The Republic
of Perú" hereinafter referred to as the "Treaty" entered into force on August
25, 2003. <u>Article 19, Section 2</u> in the Treaty specified that all other
treaties become null and void, leaving this Treaty as the only viable way to
extradite the Movant. (See Appendix A)

The Movant gave District counsel a Petition complete with supporting
documentation highlighting numerous violations of the Treaty. This is the same
Petition the Movant presented to two international commissions on human
rights, and it's something any competent District counsel would read since it
could possibly affect his client's case in the US. If District counsel would
have listened to the Movant or read the Petition he would have noted the
following violations:

    A. <u>Article 18</u> deals with the **Application** of the Treaty and states:
        The provisions on the Treaty shall be applied to the date of entry
        into force(August 25, 2003)
            (a) To pending extradition requests for which final descision
            has not been rendered, and
            (b) To extradition initiated subsequent to such entry into
            force, even if the crimes were committed prior to that date,
            provided at the time of their commission they constituted
            offenses under both contracting states.

Since the Movant's extradition process began after the date of entry into force, Clause (a) is not applicable. Note the reference in Clause (b) to "contracting" states, thus making it clear the Treaty is a contract between two parties (states/countries) and the law of contracts will help to determine what violations occurred, and will assist in recommending the solutions to settling the claims put forth by the Movant.

If District counsel would have looked at Clause (b) he would have seen how the application hinges on the phrase "provided at the time of their commission, they constituted offenses under both contracting states." thus bringing into play the **Doctrine of Dual Criminality**. The Movant's alleged crimes occurred between 1994 and 1999, with the US presumed to have laws on its books against the alleged crimes. Yet **both** contracting states must contain those same laws at the time of the offenses occurred. The Republic of Perú not only didn't have different laws or different terminology regarding the crimes in question, it had no laws on its books regarding the alleged crimes at the time of their alleged commission. With respect to Securities Fraud, Wire Fraud, Mail Fraud, the Sale of Unregistered Securities, and related Conspiracy, the laws against these activities weren't established in Perú until January 23, 2002 with the inclusion of Article 243-B, Law 27649, into the Peruvian Penal Code (see Appendix F)

The case with respect to income tax is similar in that Article 517.2(g) of the Peruvian Penal Code (See Appendix G)established that there is **no** extradition if the crime is tax related. What's more, any possible comparison goes out the window when you look at Legislative Decree 318 which states that income tax evasion,"is sanctioned by the administrative process and does not correspond to criminal law penalties."

Article 2, Section 3 of the Treaty reinforces Article 18 when it says it is an extraditable offense "so long as the underlying conduct is criminal in both states." It follows that Article 18(b) dealing with the Application of the Treaty is not applicable to the Movant because it fails the Doctrine of Dual Crimminality element specifically contained within the "Shall" clause of the Treaty. The "Shall" clause of Article 18 is ordinarily the language of

command. See Alabama v Bozeman, 533 US 146,153 (2001) (citing Anderson v
Yungkau, 329 US 482(1947)(citing Escoe v Zerbst, 295 US 490(1935) and Ex Parte
Jordan 94 US 248 (1877).

Article 6 of the Treaty deals with procedures on requirements for extradition,
and in Section 3 states:

> A request for extradition of a person who is sought for prosecution shall
> also be supported by:

>> (c)such evidence as would be sufficient to justify the committal
>> for trial on the person if the offense had been committed in the
>> Requested State.

The Requested State in this case is Perú and their definition of evidence is
contained in Article 518.1 of the Peruvian Penal Code (see Appendix H) and
says evidence:

> Must contain dates, places, circumstances surrounding the commission of
> the crime, identification of the victims, as well as legal justification
> as to why it is a punishable crime, and how the accused related to the
> events in question.

On February 6, 2014 the US Embassy in Perú sent Diplomatic Note No. 180 (see
Appendix E) to the Peruvian Ministry of Foreign Relations. The note supposedly
contained the "evidence" needed to justify the Movant's extradition. Instead,
it contained two Declarations, one by an FBI Agent and one from an IRS Agent,
stating evidence existed. Such declarations do not meet the definition of
evidence under Peruvian law making this a Treaty violation and a Due Process
violation. Something  that refers to the existence of evidence cannot in and
of itself be considered to be evidence under Peruvian law.

D. Article 13 involves the Law of Speciality and it specifically states:

> 1. A person extradited under this Treaty may not be detained, tried, or
> punished in the Requesting State except for:

>> (a)an offense for which extradition was granted, or a differently
>> denominated offense; provided that such differently denominated
>> offense

>>> (i)is based on the same facts on which extradition was
>>> granted, and would itself be an extraditable offense.

The Supreme Court has had quite a bit to say about the Rule of Speciality,

going back as far as Rauscher(1886):

> Applying the Rule of Speciality, the Court held that a person brought
> within the jurisdiction of the court under an extradition treaty can only
> be tried for one of the offenses described in the treaty, and for the
> offense for which he is charged in the proceeding for his extradition,
> until a reasonable time and opportunity have been given to him, after his
> release or trial upon such charges, to return to the country from whose
> asylum he had been forcibly taken under those proceedings. Rauscher, 119
> US at 430

As pointed out in The United States v Stokes, 726 F3d 889 (7th C. 2012), the
Rauscher decision "though old remains good law today." and has been followed
in various circuits. In The United States v Puentes, 50 F3d 1567,1574(11th C,
1995)("We believe that Rauscher clearly confers such a right on the
defendant."); United States v Cuevas, 847 F2d 1417,1426 (9th C,1998)("A person
extradited may raise whatever objections the extraditing country would have
been entitled to raise."); See also United States v Robinson 502 F3d 522,530
(6th C, 2007)("Likewise, the extradition treaty at issue contains a "Rule of
Speciality" provision which provides that Robinson shall not be punished for
any offense upon which he was not extradited.") Another 6th Circuit case,
United States v Fontana, 869 F3d 468(6th C, 2017) determined that while
Rauscher was an old case it was described with approval in United States v
Alvarez-Machain, 504 US 665(1992), and it is still good law.

In the Movant's case there were four violations with respect to Article 13's
Rule of Speciality:

> I)The Movant's original Petition for Extradition stated he was involved
> in a $20 million fraud. Once he was brought to the US it was raised to
> $30 Million and by the time he was sentenced it ballooned up to $46
> million.
> II)The Petition for Extradition did not include or mention restitution,
> but at his Sentencing Hearing he was charged with restitution.
> III)Once in the US the Movant was told he would be charged with crimes
> that allegedly occurred in the Northwest in 2008. The Movant was forced
> to accept them in a Plea Agreement negotiated by District counsel even
> though these charges were not included in the Indictment, and the Judge

used it against the Movant in his sentencing.

IV)With respect to counts 4 and 5, the Petition for Extradition stated that the Movant could not be sentenced to more then five years, <u>this is reaffirmed in Diplomatic Note 180, and yet Judge Adams sentenced the Movant to 20 years for each offense and with out the slightest objection from District counsel.</u>

District counsel was aware of all four violations and yet chose to do nothing. They were in fact a factor as they infected both the Plea Agreement and Sentencing.

It must be realized that in these Treaty violations the Doctrine of Dual Criminality is separate and distinct from the Rule of Speciality. While the Rule of Speciality, focuses on the conduct prosecuted, the Doctrine of a Double Criminality refers to the characterization of the relator's criminal conduct insofar as it constitutes an offense under the law of the respective states...no state shall use its processes to surrender a person for conduct which it dose not characterize as criminal."See Gall-Chamorro, 233 F3d 1298,1306 (5th C, 200)(citing Herbage, 850 F2d at 1465)(quoting 1M Cherif Bassiovni International Extradition: US Law and Practice 324-325 (2nd Ed.,1987)
In Autry v Wiley, 440 F2d 799,802 (1st C, 1971) the court determined that the <u>Rauscher</u> exception has been applied only in situations where an American court tries a fugitive for a crime other than the one extradition was granted; in short where there is not only a betrayal of the understanding of the surrendering nation, but an action clearly contrary to the specific authorization of the treaty by the receiving nation.(citing Johnson v Brown 205 US 309(1907). In United States v Louisiana, 339 US 699-700(1950) the court determined that an issue such as that presented herein is not an issue that can be presented to a jury since it is not an action of law and has no monetary value attached to it, only the intrinsic value of a Liberty Interest.(see Amendment Seven of the US Constitution.)

With respect to the above mentioned fourth violation of the Rule of Speciality it becomes even more complicated by the subsequent Ex Post Facto Clause

violation of the US Constitution. The violation made the punishment harsher for the crime then was allowed by law at the time the alleged crimes were committed. Of course District counsel did nothing to protect the Movant's rights and Appellate counsel preferred to focus on minutia. All of which amount to a Rule 11 violation.

The remedy for a violation of the Article 13 Rule of Speciality requires the Movant be released back to Perú as was done with Rauscher in the stare decisis for this case. Given the numerous Treaty violations in this case, violating the Movant's Rights to Due Process, a Liberty Interest, The Ex Post Facto Clause of two sovereigns, plus Articles 2, 6, 13, 18, and 19 of the Treaty, the Movant at the very least asks that the Sentence and Plea Agreement be vacated, but the true remedy is to return the Movant to Perú as expeditiously as possible, as was stated in the Head Money Cases, 112 US 580(1886)

<u>Memorandum of Law — Ground 4</u>

A: On July 13, 2016 the Movant and District counsel signed a **Plea Agreement** whereby the Movant pled Guilty to eight counts. The agreement provided, in relevant part:

> Joint Recommendation to use the Advisory Sentencing Guidelines Computations,
> ...the parties agree to recommend that the Court impose a sentence within the range of the kind specified pursuant to the advisory Sentencing Guidelines in accordance with the computations and stipulations set forth below. Other then requesting a one-level variance as provided below, neither party will recommend or suggest in any way that a departure or variance is appropriate, either regarding the sentencing range or the kind of sentence.(Appendix L, PgID# 156)

Following the recommendations agreed to, the total offense level was either 29 or 30, while the PSR came up with the Advisory Guideline Sentencing Range of 87 - 108 months.(See PSR, 226,230

Instead of adhering to the terms of the Plea Agreement the Prosecution not only failed to recommend a sentence within the guidelines, they used inflammatory rhetoric, likening the Movant to an "atomic bomb" exploding in Northeast Ohio. "When a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Santobello v New York, 404 US 257,262 (1971) "Because a defendant obtains a plea agreement only at the expense of his constitutional rights, prosecutors are held to a meticulous standards of performance." United States v Moncivais, 492 F.3d 652,662 (6th C, 2007). "Satisfying this obligation requires more then lips service on a prosecutor's part. The Santabello rule 'proscribes not only explicit repudiation of the government's assurances, but must in the interests of fairness be read to forbid end-runs around them."ld (quoting United States v Saxena, 229 F.3d 1,6 (1st C, 2000). See also United States v Canada, 960 F.2d at 269 (1st C, 1992)(finding violation where prosecutor's "urging of a 'lengthy period of incarceration' sounded like encouragement for a sentence greater then" the agreed-upon 36 months).

District counsel did not object in any way, ignoring the possibility of plain error, to a clear violation of the Plea Agreement which he negotiated. District counsel allowed the prosecution to effectively "green light" the judge into exceeding the Sentencing Guidelines to the point where the Movant ended up with illegal sentences. Further more, District counsel was grossly negligent when he violated the Plea Agreement by himself failing to recommend a sentence within the guidelines.

B On November 8, 2016 at 4:52pm, the eve of the sentencing hearing, the Probation Officer sent to District counsel 79 <u>Victim Impact Letters</u> comprising more then one hundred pages. All the names along with other relevant information had been redacted, and a significant number were done by children or grandchildren of deceased victims. The US Attorney's office had date stamps as early as October 11, 2016 on some of the letters, but purposefully withheld them until the last possible minute. At 10:16am on November 9, 2016, 14 minutes before sentencing the Movant was given 100+ pages and told he could have a "short period of time" to review them, but they would go ahead with sentencing. Sentencing began 15 minutes later.

The 6th Circuit previously held that the failure to make a timely disclosure of victim impact letters constitututes plain error. See United States v Hayes 171 F.3d 389,395 (6th C, 1999)(reversing and remanding where the district court had considered undisclosed victim letter even though the sentence was within the guideline range).

> Notice and opportunity to be heard are the core of due process. Rule 32 requires that except in certain limited circumstances...the defendant must have the opportunity to review information that will be used for sentencing...the right to review other information relied on by a court at sentencing is implicit in the adversarial scheme created by Rule 32... ld at 392-394

Also, the District Counsel should have known that the Movant could not have formulated an intelligent response to the victim letters because the writers identities remained concealed. See United States v Hamad, 495 F.3d 241,251 (6th C, 2007). Resolving the issue, the Court held that a sentencing decision based on anonymous information "not only handicapped [defendant's] ability to contest those accusations, but also undercut Rule 32's purpose of promoting focused adversarial resolution of the legal and factual issues relevant to fixing Guideline sentences." ld at 250

C. There is no apparent basis in the record to support Judge Adams regarding the <u>relative culpability</u> of the Movant and the Co-Conspirators. Judge Adams concluded the "roles of involvement" of Esposito and Shisler" is certainly distinctly different then the others". District counsel should have asked Judge Adams, who did not sentence Shisler or Espasito, if he had access to their PSR's or other sources of information without mentioning these materials or providing them to defense counsel. The information in the Movant's PSR and Plea Agreement- the only pertinent data actually in the record- were that Shisler, Espostio and Binge were "co-conspirators" with the Movant.

In Coppenger, a case which also arose from a sentencing by Judge Adams, he used "information in presentence reports prepared for [the defendant's] co-conspirators to vary upward and sentence the [defendant] to 120 months of prison." 775 F.3d at 801 (6th C, 2015). The Appeals Court reversed, finding plain error, because Judge Adams had "failed to provide [defendant] meaningful opportunity to respond to information used to vary upward. ld. In this case District counsel failed to see the prejudice is the same. Also see United States v Christman 509 F3d 299,312 (6th C, 2007).

Judge Adams did not provide the parties any notice of his intention to impose an upward variance and most certainly offered no hint of the magnitude of the variance. With respect to the Supreme Court's decision in Irizzary v United States 533 US 708 (2008) the 6th Circuit Court of Appeals when discussing Rule 32(i)(1)(B) has recognized:

> However, the rule clearly requires the sentencing court to use a procedure that affords the defendant a reasonable opportunity to respond. This is consistent with our recognition in [United States v Rossi 422 F. Appx 425 (6th C, 2011), that lrizzary "left open the possibility of relief when a party demonstrates that the facts or issues on which the district court relied to impose a variance came as a surprise and that his or her presentation to the court was prejudiced by the surprise."

Coppenger 775 F3d at 804. District counsel's failure to recognize and respond to Judge Adams violation of rule 32 clearly prejudiced the Movant.

Memorandum of Law - Ground 5

I. The Movant claims District counsel was ineffective when he failed to recognize prosecutorial misconduct. The Indictment and the charges therein were prepared by the US Attorney's Office. The complaint was brought before a Grand Jury and the Indictment was handed down on October 15, 2003 and it contained 10 counts (Appendix J, Pg #1). Count 2 was based on an Ex Post Facto statute that came in to existence 3 years after the Petitioner (Movant) supposedly committed his alleged crimes. The count in question is defined as :

    - 15USC§78j(b) and 78ff(a); CFR§240.106-5
and the description is "Securities Fraud." Also, you'll see the "Statutory Penalty" is:
    - 20 years and/or $5 million fine; 5 years supervised release; $100 SA

As previously stated in "Ground 1" the Movant's Indictment and Judgement both state the alleged offense conduct charged had concluded by August 27, 1999. The above mentioned "Statutory Penalty" in derived from the Sarbanes Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 which increased the statutory maximum sentence from 10 to 20 years. Imposing a sentence in excess of the statutory maximum of 10 years in effect at the time of the Movant's alleged crimes violates the Ex Post Facto Clause of the US Constitution.

Once the Indictment was handed down, counts 4 and 5:

    - 18USC§1343 (Wire Fraud)
    - 18USC§1341 (Mail Fraud)

originally listed the Statutory Penalty as 5 years each but were modified by the US Attorney's Office to reflect a penalty of 20 years. These modifications were also based on the Sarbanes Oxley Act of 2002 and are likewise violations of the Ex Post Facto Clause of the US Constitution. Once these changes had been made the State Department took the Indictment and in 2010 formulated a request for the Movant's extradition from his home in Peru. In December 2013 the Movant was arrested in Peru and immediately incarcerated in the Miguel Castro Castro maximum security prison.

While the Movant was incarcerated an observation from Peru obliged the US Attorney's Office to instruct the State Department to change the statutory penalties for counts 4 and 5 back to the legal sentence of 5 years. The US Embassy did this using Diplomatic Note# 180 (Appendix E); it refers to and corrects Diplomatic Note# 303 (not available) which stated the sentences for counts 4 and 5 were 20 years each. The correction took place in 2014, several months after the Movant's arrest, and clearly shows how the US Attorney's Office was aware of no less than two of the Ex Post Facto violations.

Once the Movant was extradited to the US in October 2015 the US Attorney's Office changed the statutory penalties for counts 4 and 5 back to 20 years, once again two clear violations of the Ex Post Facto Clause thereby making a total of three violations (including count 2). There is no way for a reasonable man to construe these actions, other than to say it was intentional, done in bad faith, and designed to deny the Movant of his legal rights.

The three Ex Post Facto violations permeate every facet of the Movant's legal process, from Indictment on thru arraignment, the plea agreement, changes of plea

1

hearing, and sentencing. The fact the US Attorney's Office included them in the plea agreement, with District counsel's blessing, shows what the real intent was, i.e., the denial of the Movant's rights. The end result of the abuse is an illegal sentence which the government finally admitted to two years later (Appendix B, Pg#2). The abuse is clearly a violations of the Movant's 8th Amendment rights as excessive fines/punishment were imposed, his 5th Amendment right to due process of law, and his 6th Amendment rights of the accused.

Prosecutors have a particularly strong obligation to act fairly because, as the Supreme Court explained, they are the representatives "not of an ordinary party to the controversy, but of a sovereignty whose obligation to govern impartially, is as compelling as its obligation to govern at all: and whose interest therefore, in a criminal prosecution is not that it shall win the case, but that justice shall be done." In this particular cases, an injustice was done and with  District counsel's implicit approval.

All of this documentation was available to the District counsel but he could not be bothered to examine the documents. Also, he never took the time to ask for the original Petition for Extradition, along with Subsequent modifications, even though the Movant asked for them on numerous occasions. The fact that District counsel ignored the prosecutorial misconduct goes to the heart of the Movant's claim of ineffective assistance of counsel.

II. The Treaty in question entered into force on August 25, 2003 and specified in Article XIX that all other treaties between the two nations became null and void when this particular treaty too effect. This left the Treaty in question as the only viable means to extradite someone from one country to another. With that is mind an examination of one particular Article contained within the Treaty will provide perspective into violation claimed by the Petitioner. Specifically, a look at Article XVIII, Application, which states:

> "The provisions of this Treaty shall apply from the date of its entry into force:
>> (a) to pending extradition requests for which a final decision has not yet been rendered; and
>> (b) to extradition requests initiated subsequent to such entry into force, even if the crimes were committed prior to that date, provided that at the time of their commission, they constituted offenses under the laws of both Contracting States."

Since the US never bothered to ask for the Petitioner's extradition until 2010, seven years after the Treaty came into force, (a) does not apply.

The Petitioner will ignore that Peru had no laws on it books prohibiting the Petitioner's alleged activities at the time of their occurance, and focus solely on the line, "even if the crimes were committed prior to that date." Now consider that Article 1, Section 9, Clause 3 of the US Constitution states that, "No Bill of Attainder or ex post facto Law shall be passed." The Petitioner maintains that Article XVIII(b) of the Treaty is in violation of Article 1, Section 9, Clause 3 of the US Constitution.

Although some may claim that treaties are a civil construct, extradition is part of a process involving criminal prosecution, based on a criminal indictment, and in the Petitioner's case led to his immediate incarceration in a South American prison.

Therefore, it is a criminal process. As the Court pointed out in Landgrat vs USI Film Products, 511 US 244, 266-267 (1994):

"The ex post facto clause flatly prohibits retroactive application of penal law. The prohibition on "Bills of Attainder in Article 1 §§ 9-10, prohibits legislatures from singling out disfavored persons and meting out summary conduct for past conduct. The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation, a justification sufficient to validate a statute's prospective application may not suffice to warrant its retroactive application."